**No. 15-15639**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

STEPHEN WYNN and WYNN RESORTS LIMITED
*Plaintiffs-Appellants*

v.

JAMES CHANOS
*Defendant-Appellee*

_____

Appeal from United States District Court for the
Northern District of California, Case No. 3:14-cv-04329-WHO
(Honorable William H. Orrick)

_____

**APPELLANTS' OPENING BRIEF**

_____

Barry B. Langberg (CA Bar No. 48158)
Deborah D. Drooz (CA Bar No. 133355)
Mitchell J. Langberg (CA Bar No. 171912)
Margo J. Arnold (CA Bar No. 278288)
BROWNSTEIN HYATT FARBER & SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, California 90067
(310) 500-4600 – Telephone
(310) 500-4602 – Facsimile
E-mail: blangberg@bhfs.com
E-mail: ddrooz@bhfs.com
E-mail: mlangberg@bhfs.com
E-mail: marnold@bhfs.com

*Attorneys for Plaintiffs-Appellants*
STEPHEN WYNN and WYNN RESORTS LIMITED

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1, Plaintiff-Appellant Wynn Resorts Limited hereby certifies that it has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

I.      STATEMENT OF JURISDICTION ................................................1

II.     STATEMENT OF ISSUES ON APPEAL ....................................1

III.    ADDENDUM OF PERTINENT RULES ......................................1

IV.     REVIEWABILITY AND STANDARD OF REVIEW ...................2

V.      SUMMARY OF ARGUMENT.....................................................2

VI.     STATEMENT OF THE CASE ...................................................3

    A.     The Gods of Gambling Panel Discussion ...........................3

    B.     Chanos Publishes the Offending Statements......................4

    C.     The Audience was Familiar with Chanos' Background ......5

    D.     The Challenged Statements Are False ...............................6

    E.     Procedural History.............................................................7

VII.    ARGUMENT...............................................................................8

    A.     The District Court Erred by Striking Plaintiffs' Claim as a
        "SLAPP" Suit Under California Code of Civil Procedure Sec.
        425.16 ................................................................................8

        1.     The Supreme Court's Decisions in Hanna, Walker,
            Woods and Shady Grove Mandate the Application of
            Federal Rules Over Conflicting State Law ..............10

        2.     The Anti-SLAPP Section Collides with Rules 12 and 56 .......16

        3.     The Newsham Decision Should be Overruled........................21

    B.     The Court Erred in Dismissing the First Amended Complaint
        Pursuant to FRCP 12(b)(6) and CCP Section 425.1 6 Because it
        Alleged Facts Sufficient to Permit a Reasonable Inference that
        the Challenged Statements are Defamatory .......................23

        1.     The challenged statements are capable of a defamatory
            interpretation when viewed in context....................................24

        2.     The audience was repeatedly told that Macau gambling
            was suffused with crime.........................................................27

        3.     The audience knew Chanos' reputation for uncovering
            corporate corruption by conducting intensive research ..........28

# TABLE OF CONTENTS
## (continued)

**Page**

4.     Chanos described Mr. Wynn's Macau casino in pejorative terms ........................................................................ 29

5.     Chanos' qualifying language did not neutralize the defamation ............................................................................. 30

6.     The FAC's allegations concerning context are key to the defamatory meaning analysis ................................................ 30

C.     The District Court Erred in Finding that Appellants Failed to Make a Prima Facie Showing of Actual Malice ................................ 34

VIII.  CONCLUSION ............................................................................. 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abbas v. Foreign Policy Group, LLC,*
781 F. 3d 1328 (D.C. Cir. 2015)........................................................................8

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).........................................................................................20

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007).........................................................................................19

*Bose Corp v. Consumers Union,*
692 F.2d 189 (1st Cir. 1982) *aff'd* 104 S. Ct. 1949 (1984) ..............................35

*Burlington Northern Railroad Co. v. Woods,*
480 U.S. 1 (1987)......................................................................................*passim*

*Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*
356 U.S. 525 (1958).........................................................................................11

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).........................................................................................20

*In re: Cement Antitrust Litigation v. Ideal Basic Industries, et al,*
673 F. 2d 1020 (9th Cir. 1981) ........................................................................18

*Church of Scientology v. Flynn,*
744 F.2d 694 (9th Cir. 1984) ...........................................................................25

*Clegg v. Cult Awareness Network,*
18 F.3d 752 (9th Cir. 1994) ...............................................................................2

*Clemens v. Daimler Chrysler Corp.,*
534 F.3d 1017 (9th Cir.2008) ..........................................................................20

*Condit v. National Enquirer,*
248 F.Supp.2d 945 (E.D. Cal. 2002) ...............................................................25

*Curtis Publishing Co., v. Butts,*
388 U.S. 130 (1967).........................................................................................37

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
  511 U.S. 863 (1994)................................................................1

*Eastwood v. National Enquirer*,
  123 F.3d 1249 (9th Cir. 1997) .................................................34

*Erie R. Co. v. Thompkins*,
  304 U.S. 64 (1938)............................................................8, 10

*Falco v. Nissan North America Inc.*,
  2015 WL 3498254 (C.D. Cal. June 3, 2015) .................................18

*Gilligan v. Jamco Dev. Corp.*,
  108 F.3d 246 (9th Cir.1997) ...................................................20

*Guaranty Trust Co. v. York*,
  326 U.S. 99 (1945)..............................................................10

*Hanna v. Plumer*,
  380 U.S. 460 ...............................................................*passim*

*Harte Hanks Communications, Inc. v. Connaughton*,
  491 U.S. 657 (1989)............................................................37

*Information Control Corp. v. Genesis One Computer Corp.*,
  611 F.2d 781 (9th Cir. 1980) ..................................................24

*Kaelin v. Globe Comm. Corp.*,
  162 F.3d 1036 (9th Cir. 1998) .......................................24, 25, 26

*Lewis v. Time, Inc.*,
  710 F.2d 549 (9th Cir. 1983) ..............................................24, 33

*Makaeff v. Trump Univ., LLC*,
  715 F.3d 254 (9th Cir. 2013) ...................................................2

*Masson v. New Yorker Magazine, Inc.*,
  960 F.2d 896 (9th Cir. 1992) ..................................................36

*Metabolife International v. Wornick*,
  264 F. 3d 832 (9th Cir. 2001) .............................................*passim*

*Milkovich v. Lorain Journal,*
  497 U.S. 1 (1990)................................................................24, 32, 33

*Navarro v. Block,*
  250 F.3d 729 (9th Cir.2001) ..............................................................20

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.,*
  190 F.3d 963 (9th Cir. 1999) .......................................................18, 22

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Insurance Co.,*
  559 U.S. 393 (2010).....................................................................*passim*

*Shropshire v. Fred Rappaport, Co.,*
  294 F. Supp.2d 1085 (N.D. Cal 2003) ...............................................19

*Sibbach v. Wilson & Co.,*
  312 U.S. 1 (1941)................................................................................11

*St. Amant v. Thompson,*
  390 U.S. 727 (1968)...........................................................................34

*Standing Committee on Discipline v. Yagman,*
  55 F.3d 1430 (9th Cir. 1995) .......................................................32, 33

*Suzuki Motor Corp. v. Consumers Union of U.S. Inc.,*
  330 F.3d 1110 (9th Cir. 2003) ...........................................................37

*Underwager v. Channel 9 Australia,*
  69 F. 3d 361 (9th Cir. 1995) ..............................................................31

*Unelko Corp. v. Rooney,*
  912 F.2d 1049 (9th Cir. 1990) .....................................................31, 33

*Walker* v. *Armco Steel Corp.,*
  446 U.S. 740 (1980).................................................................9, 11, 17

**State Cases**

*Baker v. L.A. Herald Examiner,*
  42 Cal. 3d 254 (1986) ........................................................................24

*Bently Reserve, LP v. Papaliolios,*
  218 Cal. App. 4th 418 (2013) .............................................................31

*Good Government Group of Seal Beach v. Superior Court*,
  22 Cal. 3d 672 (1978) ...................................................................26

*Jarrow Formulas, Inc. v. LaMarchce*,
  31 Cal. 4th 728 (2003) ..................................................................21

*Kibler v. N. Inyo County Local Hospital District*,
  39 Cal. 4th 192 (2006) ..................................................................21

*Navellier v. Sletten*,
  29 Cal. 4th 82 (2002) ....................................................................35

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
  151 Cal.App.4th 688 (2007) .....................................................32, 35

*Selleck v. Global International*,
  166 Cal. App. 3d 1123 (1985) ...................................................26, 29

*Weller v. American Broadcasting Companies, Inc.*,
  232 Cal. App. 3d 991 (1991) .........................................................26

*Wilbanks v. Wolk*,
  121 Cal. App. 4th 883 (2004) ........................................................32

**Federal Statutes**

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 2072(a) .........................................................................8

Federal Rules of Civil Procedure § 1 ................................................9

Federal Rules of Civil Procedure § 56(a) .........................................20

**State Statutes**

California Code of Civil Procedure § 425.16(i) ................................18

California Code of Civil Procedure § 425.16(b) ...............................17

California Code of Civil Procedure § 425.16(b)(1) and (3) ..............18

California Code of Civil Procedure § 425.16(b)(f) & ........................9

California Code of Civil Procedure § 425.16(c)(1) ................................................18

**Other Authorities**

Restatement (Second) of Torts § 566 ...................................................................24

## I.     STATEMENT OF JURISDICTION

This court has jurisdiction to hear appeals from final judgments and orders. 28 U.S.C. § 1291; *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867–68 (1994).  The District Court's granting, without leave to amend, of Defendant's Motion to Dismiss and its granting of Defendant's Special Motion to Strike under California Code of Civil Procedure § 425.16 are final orders from which appeals can be taken.

## II.    STATEMENT OF ISSUES ON APPEAL

A.     May California Code of Civil Procedure Section 425.16, the "anti-SLAPP statute," properly be applied to Plaintiffs' defamation claim in this diversity case?

B.     Did the trial court err in finding, as a matter of law, that the statements challenged by the First Amended Complaint ("FAC") are incapable of any defamatory interpretation when Plaintiffs alleged that the defamatory sting of the statements is context-dependent and alleged contextual facts sufficient to permit the construction asserted in the complaint and, therefore, granting both Defendant's Motion to Dismiss pursuant to FRCP 12(b)(6) ***and*** his anti-SLAPP motion pursuant to California Code of Civil Procedure Section 425.16?

C.     Assuming the applicability of the anti-SLAPP statute, did the trial court err in finding that Plaintiffs did not establish a "probability of prevailing" on the merits of the "actual malice" fault element of their defamation claim when Plaintiffs twice sought (but were denied) discovery on that fact-dependent issue?

## III.   ADDENDUM OF PERTINENT RULES

Pursuant to Circuit Rule 28-7, the full text of the pertinent rules discussed throughout this brief – Federal Rules of Civil Procedure 12(b) and 26 and California Rules of Civil Procedure Section 425.16 – is included in the

concurrently filed Addendum to Appellant's Opening Brief.

## IV.   REVIEWABILITY AND STANDARD OF REVIEW

The district court's determination of a motion to strike under California's anti-SLAPP statute is reviewed de novo.  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).

Review of dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is a ruling on a question of law and as such is also reviewed de novo."  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994)

## V.   SUMMARY OF ARGUMENT

Three distinct arguments are advanced here.  The first is that California Rules of Civil Procedure Section 425.16, California's "anti-SLAPP" statute, is inapplicable in case before the federal district courts on the ground of diversity. The United States Supreme Court has repeatedly held that the federal courts must apply the Federal Rules of Civil Procedure when those rules answer the question at issue, and must ignore conflicting state laws that answer the same question.  The anti-SLAPP statute and Federal Rules of Civil Procedure 12 and 56 serve the same procedural purpose:  They weed out meritless claims before trial.  However, the Federal Rules and the anti-SLAPP statute conflict in material respects.   The application of the anti-SLAPP statute in this federal diversity action not only interfered with the independent operation of the Federal Court system but improperly encroached upon Congress's exclusive grant of power over federal procedure under The Rules Enabling Act.

Second, the District Court erred in holding that the challenged statements are not reasonably susceptible to any defamatory interpretation. and dismissing the lawsuit on a Motion to Dismiss and anti-SLAPP motion.  Appellants submit that

the Court failed to apply the "totality of circumstances" test applicable in the Ninth Circuit. Specifically, the Court failed to evaluate the statements as a whole and in the context in which they were made. The Court also failed to acknowledge that actionable defamation includes defamation by implication. In addition, the Court disregarded the "mixed opinion" analysis of *Milkovich v. Lorain Journal* and its progeny, memorialized in Restatement (Second) of Torts Section 566, and followed by the Ninth Circuit in numerous opinions. Under this approach, statements published in the form of an "opinion" may be actionable if, as in this case, it implies the existence of undisclosed facts that are themselves defamatory of the plaintiff.

Finally, assuming the applicability of the anti-SLAPP statute, the trial court erred in finding that Appellants could not meet their burden of demonstrating a "likelihood of prevailing" on the actual malice element of their defamation claim. Actual malice is a question of fact that measures defendant's subjective state of mind toward the truth of his publication. As this Court recognized in *Metabolife v. Wornick*, a public figure plaintiff may not be put to his proof on that issue unless he is afforded an opportunity to conduct discovery. In this case, the District Court twice denied Appellants' request for discovery on the actual malice issue.

## VI.   STATEMENT OF THE CASE

### A.   The *Gods of Gambling* Panel Discussion.

This action arises from hedge fund manager James Chanos' statements during a panel discussion of a forthcoming television program entitled *The Gods of Gambling* (the "Program"). The *Gods of Gambling* was an exposé about gaming in Macau, a special administrative region of China. Its central thesis was that the United States-based casinos of the region, including Appellants' establishment Wynn Macau, operate in a crime-ridden environment and not only benefit from but

- 3 -

condone illegal activity.  Excerpt of Record ("EOR") Vol. 8, pg. 1476.

Director Lowell Bergman set the tone for the panel discussion by screening a forty-five minute, videotaped "introduction" to the *Gods of Gambling*.  EOR Vol. 8, pg. 1477.  When the lights came up, panelist David Barboza underscored *The Gods of Gambling's* theme:  "As I said in the piece, *the rule of law is not in place in China* yet," '*illicit cash*' is in circulation there, and it is the '*robber barons*' era that you're finding in China."[1]

## B. Chanos Publishes the Offending Statements.

Following Barboza's remarks, Bergman introduced Chanos to the audience, noting that Chanos is "famous, obviously, for shorting Enron."  Bergman then asked, "*Why are you shorting Macau in China*?"[2]  Chanos' response contained the offending statements that gave rise to this action:

> …we were actually long Macau for a while. And when we first put our short bet on in China in late '09, 2010… we were actually long Macau casinos on the thought that I wanted to be long corruption and short property. And that actually worked out pretty well, but even I got a little nervous **the deeper we dug into Macau and the more I got concerned that, although I was long, the U.S. casino operators like Mr. Adelson and Mr. Wynn, I began to really get concerned about the risk I was taking with clients' money under Foreign Corrupt Practices Act** and a variety of other, you know, aspects of exactly how business is done there. And, although, they hide behind the facade of the junket companies, increasingly, from a – if not across the legal line… it was "legal fraud."

EOR Vol. 8, pgs. 1493-1494.[3]  In this discourse, Chanos informed the audience

---

[1] EOR Vol. 8, pg. 1492.
[2] EOR Vol. 8, pg. 1493.

that he originally held a "long" position in two United States based casinos in Macau: those operated by "Mr. Adelson and Mr. Wynn." However, after conducting an investigation that "dug deeper" into their operations, he uncovered evidence of Foreign Corrupt Practices Act ("FCPA") violations that caused him "concern" about those "long" positions. That concern prompted him to abandon those positions and to "short" the stock. The statements, after all, were made in response to the question, "Why are you shorting Macau in China?" EOR Vol. 8, pgs. 1493-1495.

Chanos' implicit but readily comprehensible message was that Wynn Macau was involved in FCPA violations. At the very least, Chanos implied that FCPA violations were taking place at Wynn's establishment, and that such violations created a risk that was sufficiently serious to cause Chanos to overhaul his investment strategy. Chanos implies that findings of fact – uncovered during his "deep digging" – gave rise to his "concerns" about FCPA violations that threatened his investment in Wynn Macau stock. EOR Vol. 8, pgs. 1477-1478.

### C. The Audience was Familiar with Chanos' Background.

Chanos is a well-known, "research-intensive" short seller and hedge fund manager. He came to fame in late 2000 by uncovering financial corruption at Enron Corporation and then short-selling Enron stock before the company's historic collapse. EOR Vol. 10, pgs. 1960-1970. The members of T*he Gods of Gambling* audience were well-educated and well-informed. EOR Vol. 8, pg. 1481. They were aware of Chanos' success in shorting Enron stock and knew his reputation for thoroughly investigating the companies in which he planned to invest. EOR Vol. 8, pg. 1476. Specifically, they knew that he was renowned for "digging deep" into megacorps' financial data, uncovering fraud or corruption, and then making a "short bet" that the company would fail. EOR Vol. 10, pgs. 1960-

1970; EOR Vol. 8, pg. 1481.  Armed with this knowledge, the audience was predisposed to understand that Chanos appeared on *The Gods of Gambling* panel to explain how he "shorted" "U.S. casino operator"  "Mr. Wynn" just as he had shorted Enron.

**D.    The Challenged Statements Are False.**

Appellants are engaged in a highly regulated industry and are frequently questioned, reviewed and investigated by both federal and state agencies regarding their anti-corruption policies and compliance history.  At no time has any agency ever notified either Appellant that it has been found to have engaged in any conduct that violates the FCPA.  EOR Vol. 10, pg. 2046; EOR Vol. 10, pg. 88.  Appellants employ rigorous policies and practices to prevent violations of the FCPA.  Each of Appellants' directors, officers and employees in management positions are required to participate in regular anti-corruption compliance training.  Appellants conduct thorough background checks before contracting with third parties who provide goods and services to Wynn establishments.  EOR Vol. 10, pg. 2046.

 In July of 2013 – nine months prior to Chanos' appearance on *The Gods of Gambling* panel, the Securities and Exchange Commission (SEC") and the Nevada Gaming Board ("NGB") announced publicly that they had conducted thorough investigations of Appellants and their related companies in connection with allegations of FCPA violations.  Both agencies concluded that there was "no evidence" that Appellants engaged in any conduct that violates the FCPA.  EOR Vol. 10, pgs. 1917-1956.   The SEC and NGB's findings were public records and were widely disseminated.  EOR Vol. 10, pgs. 1917-1956.  They put to rest any uncertainty regarding Appellants' compliance with applicable law.

The Massachusetts Gaming Commission ("MGC") also conducted an

investigation of Appellants in connection with a gaming license application. Like the SEC and NGC investigations, the investigation included not only the operations of the parent company, Wynn Resorts, Limited, but also its related companies including Wynn Macau. MGC investigated Appellants for compliance with FCPA policy and protocol. In that regard, it examined "all critical SEC filings … for the past three years." Appellants' anti-FCPA policies were deemed "state of the art," and consistent with FCPA "best practices." *See* EOR Vol. 9, pgs. 1660-1884. The investigation report concluded that Appellants demonstrated their qualification for licensure by clear and convincing evidence." Rumboltz, Feb 6, 2015, Decl. and Report. If any evidence of FCPA violations had existed, these government investigations would have uncovered it. *See* EOR Vol. 9, pgs. 1660-1884.

### E.   **Procedural History.**

The complaint in this action was filed on September 25, 2014.

Defendant's first Motion to Dismiss and Special Motion to Strike were filed on October 20, 2014.

Plaintiffs filed their first Motion for Order Granting Discovery pursuant to FRCP Rule 56(D) and California Code of Civil Procedure 425.16(g) on October 27, 2014. The court denied that motion by order dated November 4, 2014.

On December 16, 2014, the court granted Defendant's first Motion to Dismiss with leave to amend.

On January 12, 2015, Plaintiffs filed their First Amended Complaint ("FAC").

Defendant filed his second Motion to Dismiss and second Special Motion to Strike on January 26, 2015.

Plaintiffs filed their second Motion for Discovery Under Rule 56(d) for

Denial of Defendant Chanos's Special Motion to Strike First Amended Complaint Pursuant to C.C.P. Sec. 425.16 on February 13, 2015. The court denied that motion by order dated March 3, 2015.

On March 3, 2015, the court issued the order appealed from here. It granted Defendant's second Motion to Dismiss without leave to amend and granted Defendant's second Special Motion to Strike.

Plaintiffs filed Notice of Appeal on April 2, 2015.

## VII. <u>ARGUMENT</u>

### A. <u>The District Court Erred by Striking Plaintiffs' Claim as a "SLAPP" Suit Under California Code of Civil Procedure Sec. 425.16.</u>

Federal courts are required to follow the Federal Rules of Civil Procedure ("Federal Rules" or "FRCP") and must ignore conflicting state laws that interfere with their operation. *Hanna v. Plumer*, 380 U.S. 460, 471(1965); *Erie R. Co. v. Thompkins,* 304 U.S. 64, 78 (1938) (Federal law applies to matters governed by "*acts of Congress*."). Federal rules take precedence over state law because they were promulgated under the authority that Congress delegated to the Supreme Court by the Rules Enabling Act ("REA"), 28 U.S.C. § 2027. The REA provides that "the Supreme Court *shall* have the power to prescribe general rules of practice and procedure … for cases in the United States district courts … and courts of appeal." 28 U.S.C. § 2072(a). Federal Rule of Civil Procedure, Rule 1 underscores the mandatory nature of the rules: "These rules govern the procedure in *all* civil actions and proceedings in the United States district courts[.]"

Federal Rules 12 and 56 establish the exclusive standards for granting pre-trial judgment to defendant in federal court. *Abbas v. Foreign Policy Group, LLC*, 783 F. 3d 1328, 1334 (D.C. Cir. 2015). They "occupy the field" on the issue and leave no room for the operation of conflicting state law. If a plaintiff meets the

Rule 12 and 56 standards, s/he is entitled to a trial.

The "anti-SLAPP" statute is a state rule of procedure. It provides an expedited process for vindicating existing rights of petition and speech when those rights are exercised in specific situations. Like Federal Rules 12 and 56, the statute's objective is to screen out unmeritorious claims at an early stage in the proceedings. It answers the question, "what conditions must plaintiff meet before he is entitled to a trial?" However, the statute's standards for pre-trial termination are different from those prescribed by the Federal Rules and require plaintiff to meet an evidentiary burden not contemplated those rules. Specifically, the statute requires that plaintiff demonstrate a "likelihood of prevailing" on the merits of his claim at a nascent stage in the proceedings, without benefit of discovery. *See* Cal. Civ. Proc. Code § 425.16(b)(f) & (g).

Because the anti-SLAPP statute imposes different standards for the pretrial termination of a claim, it necessarily conflicts with Rules 12 and 56. Its use in federal courts undermines the smooth operation of the federal system and interferes with a process calibrated to provide a "just, speedy and inexpensive determination of every action and proceeding."[4] The statute is inapplicable in federal court and was inapplicable in this diversity case. The trial court's grant of Defendant's anti-SLAPP motion was error.

In four consistent decisions, the Supreme Court has held that federal courts sitting in diversity may not apply state law if a Federal Rule speaks to the same question as the state law and falls within the purview of the REA. *See Hanna v. Plumer*, 380 U.S. at 460 ("*Hanna*"), *Walker* v. *Armco Steel Corp.*, 446 U.S. 740 (1980) ("*Walker*"), *Burlington Northern Railroad Co. v. Woods*, 480 U.S. 1 (1987) ("*Woods*"), and *Shady Grove Orthopedic Assoc., P.A. v. Allstate Insurance Co.*,

---

[4] *See* Fed. R. Civ. P. 1.

559 U.S. 393 (2010) ("*Shady Grove*"). These decisions, discussed in detail herein, conclusively demonstrate that the Federal Rules create an independent procedural system applicable in all civil actions in federal courts, and that no state law—no matter what its objectives—can be applied to displace them.

1. **The Supreme Court's Decisions in *Hanna*, *Walker*, *Woods* and *Shady Grove* Mandate the Application of Federal Rules Over Conflicting State Law.**

In *Erie R. Co. v. Thompkins*, 304 U.S. 64, the Supreme Court held that, when federal courts sitting in diversity are faced with competing state and federal laws, they shall apply state substantive law in matters that do not involve a federal question and *shall apply federal law to procedural matters*. "*Except in matters governed by the Federal Constitution or by Acts of Congress*, the law to be applied in any case is the law of the state." *Id*. at 64. The court emphasized that "no one doubts federal power over procedure." *Id.* at 92.[5]

The Court reasoned that, while Congress has *no* power to create "substantive rules of common law applicable in a state," it has *exclusive* power to authorize rules of procedure for the federal courts, *i.e.*, the power it delegated to the Supreme Court under the REA. *Id.* at 78. Because the Federal Rules are a function of "congressional power to make rules governing the practice and pleading in [federal] court," they receive protective treatment when weighed against conflicting state laws. *See Hanna*, 380 U.S. 460, 472.

The Supreme Court has struggled to apply the broad holding of *Erie*. It has employed a variety of tests to determine whether particular federal laws are "procedural" and hence applicable or "substantive" and hence inapplicable as against a conflicting state law.[6] However, in *Hanna*, the court held that the

---

[5] *See* Justice Reed's concurring opinion. *Id.* at 90.

[6] In *Guaranty Trust Co. v. York*, 326 U.S. 99, 108-109 (1945), the court held that a crude distinction between "procedure" and "substance" is difficult to draw and is

"relatively unguided" *Erie* analysis does not apply when a district court is confronted with a choice between state law and a *federal rule of procedure*. The Court characterized as "incorrect" the "assumption that *Erie* constitutes the appropriate test of the validity and therefore the applicability of a Federal Rule of Civil Procedure." *Id.* at 469-470.

Under *Hanna*, when a Federal Rule answers the question in dispute and conflicts with state law, the court *must* apply the Rule, provided that it is valid under the REA. *Id.* at 473; *Shady Grove,* 559 U.S. 393, 417-418. In such cases, the relevant analysis consists of two questions: (1) Whether the Rule is sufficiently broad to cause a direct collision with state law, and (2) Whether the rule is valid under the Rules Enabling Act as construed in the Court's 1941 decision in *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941)[7]. *Hanna*, 380 U.S. 460, 471-472; *Walker*, 446 U.S. 740, 749-750 and n. 9.

In *Hanna*, the question before the court was whether to apply a state rule requiring personal service of process or to apply Federal Rule 4(d)(1), under which good service can be effected by leaving a copy of the summons and complaint at defendant's home. Defendant argued that, because the case would continue under

---

not always an appropriate approach for determining the applicability of federal law. Instead, the court employed an "outcome determinative" test, holding that a state statute of limitations should be applied over a federal statute of limitations. In *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.* 356 U.S. 525, 536-540 (1958), the court retreated from the "outcome determinative' test and employed an "assessment of interests" approach, holding that the federal right to a jury trial preempts a South Carolina rule against jury trials.
[7] In *Sibbach v. Wilson & Co.*, 312 U.S. 1, the court held that the test for determining whether a Federal Rule of Civil Procedure is valid under the REA is "whether [the] rule *really* regulates procedure[.]" The court defined procedure as "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Id.* at 14.

the Federal Rule but would be dismissed on statute of limitations grounds under the state rule, the Federal Rule was substantive and "outcome determinative," and that under *Erie*, the state rule must be applied.

The court rejected the "outcome determinative" test as overly rigid and as literalistic. *Hanna*, 380 U.S. at 468-469. The court explained that, when the application of a Federal Rule is in question, the "outcome determinative" test is inapplicable. The court explained that "every procedural variation is [potentially] 'outcome determinative.'" *Id.* at 470. Under such a test the Federal Rules would never be applied when a state law addressed the question at issue. That result is clearly incorrect: "The Erie rule has never been invoked to void a federal rule." *Id.*

The *Hanna* court observed that the considerations that ordinarily guide the analysis under *Erie*,[8] are beside the point when the applicability of a Federal Rule is at issue. The courts have "been instructed to apply the Federal Rules of Civil Procedure, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions." *Id.* at 471.

Importantly, *Hanna* holds that the Federal Rules apply over conflicting state law *even where the application of the Rule has an adverse effect on state substantive rights.* "To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act." *Id.* at 473-474. The significance of this reasoning in relation to the anti-SLAPP status is clear. The

---

[8] *i.e.*, whether failure to apply state law is likely to result in forum-shopping, and the degree to which the failure to apply state law would discriminate unfairly against citizens of the forum state. *Hanna* at 467-468.

application of Rules 12 and 56 to the exclusion of the Statute would arguably affect defendants' rights under the statute. It would deprive them of the benefit of the "probability of prevailing standard" of 425.16(b). It would require them to submit to discovery before a summary judgment could be granted. It would deprive them of the attorneys' fees that the statute imposes as a penalty on unsuccessful plaintiffs. However, the Supreme Court has determined that such effects must be tolerated in order to preserve the independence and integrity of the federal system.

In addition, the *Hanna* court held that even Federal Rules that are less than purely "procedural" are afforded special status and, if valid, are to be applied wherever they conflict with state law. "[T]he constitutional provision for a federal court system … carries with it congressional power to make rules governing the practice and pleading in those courts, which in turn *includes a power to regulate matters which, though falling within the uncertain area between substance and procedure*, are rationally capable of classification as either." *Hanna,* 380 U.S. 460, 476. There is no question that federal rules expressly designated as "procedural" hold this status.

Following its decision in *Hanna*, the Supreme Court has repeatedly affirmed that the so-called "*Erie* problem"—*i.e.*, the struggle to determine the applicability of state laws in federal court by the use of various tests including the "substantive" vs. "procedural" distinction, the "outcome determinative" test and "governmental interest" test—simply *does not exist* when the choice is between a state law and an applicable Federal Rule. These cases uniformly hold that, the application of a conflicting state law is improper not only because it interferes with the federal courts' orderly operation but because it flies in the face of Congress's exclusive power to make rules governing procedure in those courts.

In *Woods*, 480 U.S. 1, the Court was required to choose between Federal

Rule of Appellate Procedure 38, which *permits* an award of damages for frivolous appeals, and an Alabama state law that *mandates* such an award.

Holding that *Hanna* "set[s] forth the appropriate test for resolving conflicts between state law and the Federal Rules", the Court summarized its components. "The initial step is to determine whether, when fairly construed, the scope of [the] Federal rule is 'sufficiently broad' to cause a direct collision 'with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law. The Rule must then be applied if it represents a valid exercise of Congress' rulemaking authority, which originates in the Constitution and has been bestowed on this court by the Rules Enabling Act, 28 U.S.C. 2072." *Woods*, 480 U.S. 1, 4-5.[9] The Court found that the Federal Rule was applicable and that the state law directly conflicted with the Federal Rule by depriving the court of discretion as to whether to award damages. The Court held that the Federal Rule "must be applied" in such circumstances if it represents a "valid exercise of Congress's rule making authority which originates in the Constitution and has been bestowed on this court by the Federal Rules Enabling Act." *Id.* at 5.

It then proceeded to interpret the Rules Enabling Act's limitation that Federal Rules "shall not abridge, enlarge or modify any substantive rights." In keeping with *Hanna's* holding that Federal Rules apply over conflicting state law even where the application of the Rule has an adverse effect on state substantive rights, the Court held that *"incidental" impact on litigants' "substantive rights" under state law do not violate the REA's limitation* if the application of Federal rules is reasonably necessary to maintain the integrity of the system. *Woods,* 480 U.S. at 5.

---

[9] "Rules regulating matters indisputably procedural are *a priori* constitutional." *Woods*, 480 at 4-5.

In other words, substantive state interests must give way when the application of a Federal Rule advances clear procedural policies. When this reasoning is applied to the anti-SLAPP statute, it means that any underlying purposes intended, or substantive rights created by the statute do not undermine the supremacy of the Federal Rules. Even when the application of the Federal Rules "impacts" an arguably substantive interest, e.g., a winning defendant's entitlement to attorney's fees, such an impact does not constitute an "abridgment," "modification" or "enlargement" of a substantive right and hence does not invalidate the Federal Rule under the REA.

In *Shady Grove*, 559 U.S. 393, the Court put to rest all doubt about the Federal Rules' applicability over conflicting state law. The question before the court was whether to apply a state law prohibiting the filing of class action suits to recover a penalty or to apply Federal Rule 23, which contains no such prohibition. Following *Hanna*, the court explained that Rule 23 must be applied provided that it is valid under the REA. The court explained that a Federal Rule is valid under the REA when it "governs only the manner and means by which the litigants' rights are enforced," and does not change the rules by which the court will adjudicate those rights. *Id.* at 424 (internal quotations omitted). Rule 23 is valid in that it "permit[s] consolidation of multiple parties in one forum." *Id.* at 408. It merely alters "how claims are processed," and does not alter the rights underlying the claims or the rule of law that governs them. *Id.*

As in *Hanna* and *Woods,* the *Shady Grove* court emphasized that the substantive aims and objectives of the conflicting state statute do not figure into the analysis. *Shady Grove*, 559 U.S. 393, 404. State statutes do not survive preemption on the basis of the state legislature's "aspirations." Any attempt to base the determination of whether state and federal law conflict on the basis of the state legislature's subjective intentions would produce "confusion worse

confounded." *Id.* (quoting *Shibbach*, 312 U.S. 1, 14). Where the plain text of the state statute conflicts with a valid Federal Rule, the district court must apply the Federal Rule and may not engage in an analysis of the substantive objectives of the state law. "The manner in which the law 'could have been written' has no bearing; What matters is the law the [state] Legislature did enact. We cannot rewrite that to reflect our perception of legislative purpose." *Shady Grove*, 559 U.S. at 403.

Indeed, under *Shady Grove*, the substantive nature or purpose of the state law "*makes no difference. Id.* at 409. A federal rule of Procedure is not valid in some jurisdictions and invalid in others … depending upon whether its effect is to frustrate a state substantive law. … [I]t is not the substantive or procedural nature or purpose of the affected state law that matters but the substantive or procedural nature *of the Federal Rule*." *Id.* at 409-410.

As applied to the anti-SLAPP statute, this reasoning means that the state legislature's stated concern about the "disturbing increase" in SLAPP suits, and its desire to "encourage" "participation in matters of public significance" have no effect on the analysis of whether the statute may be applied in federal court. The California legislature drafted a procedural mechanism that conflicts with the existing Federal Rules. Regardless of the objectives the legislature was trying to achieve, and regardless of the substantive rights that it may have created, the statute cannot displace the Rules.

### 2. The Anti-SLAPP Section Collides with Rules 12 and 56

In order to determine whether there is a direct conflict between a federal and state rule, the court determines whether "the purposes underlying the [Federal] Rule are sufficiently coextensive with the asserted purposes of the [state rule] to indicate that the [Federal] Rule occupies the [state rule's] field of operation." *Woods*, 480 U.S. 1, 7. *If the Rule and the state law serve the same general,*

*procedural purpose, then the two rules are in direct conflict* and the Federal Rule "preclude[s] [the state rule's] application in federal diversity actions." *Id.  See also Walker*, 447 US 751-752 (conflict exists when refusal to apply the Federal Rule thwarts some purpose that the Rule was intended to achieve).

As noted above, the anti-SLAPP serves the same procedural purpose as Federal Rules 12 and 56.  It establishes conditions which must be met for a plaintiff to get his case to trial.  But the statute conflicts with the Federal Rules in at least four respects.  First, unlike Federal Rule 12 or 56, the statute requires a plaintiff to make an evidentiary showing during the litigation's nascent stage— before he has had an opportunity to conduct discovery.  Plaintiff must demonstrate "that there is a probability that [he] will prevail on his claim."[10]  In *Metabolife International v. Wornick*, 264 F. 3d 832 (9th Cir. 2001), this court recognized that the anti-SLAPP statute directly conflicts with Rule 56(d) under which the party opposing the motion is entitled to adequate discovery before summary judgment is considered.  The court held, "Because the discovery limiting aspects of Sec. 425.16(f) and (g) collide with the discovery permitting aspects of Rule 56, these aspects of subsections (f) and (g) cannot apply in federal court.[11]  *Id.* at 845.  The ruling in *Metabolife* was an attempt to adapt the statute to the federal system but it did damage to both the system and the statute.  It allowed the statute to govern pre-trial termination—a process within the exclusive province of the Federal Rules.  And, by opening the door to discovery, it undermined the discovery prohibiting objective of the statute.

Second, unlike Federal Rule 12(b)(6), under which defendant bears the

---

[10] Cal. Civ. P. Code. § 425.16(b)(1).

[11] As discussed below, the trial court denied plaintiffs' requests for discovery of information vital to their ability to oppose defendant's anti-SLAPP motion on the issues of actual malice, privilege and context.

- 17 -

burden of proof, the allegations of the complaint are presumed true, and all doubts are resolved in plaintiff's favor, or Federal Rule 56 under which the moving party bears the burden of proving that no genuine issue of fact exists for trial, the anti-SLAPP statute places the burden of proof on the non-moving party, the plaintiff.[12] Plaintiff must not only make a prima facie showing on each element of his claim but must put on sufficient evidence to defeat defendant's Constitutional defenses. *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co*., 190 F.3d 963, 971 (9th Cir. 1999).

Third, unlike Federal Rule 12 or 56, the anti-SLAPP statute imposes a penalty on the unsuccessful Plaintiff by providing that defendant "shall" be awarded his attorneys' fees.[13]

Fourth, contrary to the federal scheme, the anti-SLAPP statute enables a defendant who asserts the statute to block the progress of even the most meritorious claims by affording him an automatic right to an immediate appeal.[14] That procedural avenue is normally unavailable to defendants in the wake of unsuccessful motions to dismiss or summary judgment attempts.[15]  It is simply not the case that the anti-SLAPP statute can co-exist with the Federal Rules in federal court.

In this case, the District Court applied state law—the "anti-SLAPP statute — to the very procedural questions addressed by the Federal Rules.  Federal Rule 12(b)(6) governs the question of whether Appellants' First Amended Complaint

---

[12] Cal Civ. Proc. Code § 425.16(b)(1) and (3).

[13] Cal Civ. Proc. Code § 425.16(c)(1).

[14] Cal Civ. Proc. Code § 425.16(i).

[15] *See In re: Cement Antitrust Litigation v. Ideal Basic Industries, et al*, 673 F. 2d 1020, 1027 (9th Cir. 1981)(interlocutory appeal under 28 U.S.C. 1292(b) to be used only in exceptional circumstances); *Falco v. Nissan North America Inc.*, 2015 WL 3498254 *2 (C.D. Cal. June 3, 2015) (same).

alleged sufficient facts to state a claim for relief that is "plausible on its face." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 56 governs whether a claim raises genuine factual questions for a trier of fact. Both eliminate meritless claims before trial. The Court protested that "Chanos' motion is not a Rule 56 motion for summary judgment, nor should it be treated as such,"[16] yet the courts of this circuit have repeatedly held that the anti-SLAPP process is analogous to summary judgment. *See Shropshire v. Fred Rappaport, Co*., 294 F. Supp.2d 1085, 1100 (N.D. Cal 2003); *Metabolife,* 264 F. 3d 832, 845-846.

In this case, the trial court ignored the rule of *Metabolife* and denied discovery on the issue of actual malice. Nevertheless, it ruled that Plaintiffs could not put on sufficient *evidence* to show a probability of prevailing on the actual malice standard. The court couched its finding in the language of Rule 12(b)(6), holding that "I found Wynn failed to plead that Chanos acted with malice because it did not plead facts that would support a finding that Chanos harbored subjective doubts about the truth of his statements." EOR Vol. 1, pg. 6. But that finding is simply inaccurate.

Appellants pled that, prior to the publication of the offending statements, two government entities – the SEC and the NGC published results of their investigation into alleged FCPA violations on appellants' part found "no evidence" of any wrongdoing. EOR Vol. 8, pgs. 1482-1483. Appellants pled that the results of these investigations were published in the news media, and that Chanos, as a sophisticated investor who admittedly "dug deep" into appellants' operations in Macau, was certainly aware of them. EOR Vol. 8, pgs. 1482-1483. Appellants pled that none of the material on which Chanos purported to rely stated or implied that appellants had actually committed any FCPA violation. EOR Vol. 8, pgs.

---

[16] EOR Vol. 1, pg. 4.

1482-1483. Appellants further pled that, following the commencement of the SEC and NGC investigations, Wynn issued a public denial of any wrongdoing on appellants' part, and that appellants' 2013 8K filing restated the SEC's and NGC's exculpatory filing, but Chanos chose to ignore this contrary evidence. EOR Vol. 8, pgs. 1482-1483. This is more than enough to satisfy rule 12(b)(6) pleading requirements. But in fact the court did more than simply evaluate the pleadings for sufficiency and plausibility. It took it upon itself to weigh the evidence and make a finding of fact.

That the anti-SLAPP statute serves the same procedural purpose as Rules 12 and 56 is apparent upon comparison. Federal Rule 12 performs a gatekeeping function. It prevents legally frivolous or factually deficient claims from moving forward. Rule 12(b)(6) motions "test the legal sufficiency of a complaint." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001). The issue is whether the claimant is entitled to offer evidence to support the claims. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997). To avoid a Rule 12(b)(6) dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir.2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Federal Rule 56 also performs a gatekeeping function: it disposes of unmeritorious claims before trial. Under Rule 56, a party is entitled to summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the non-movant need only "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

Like Rules 12 and 56, the anti-SLAPP statute is a gatekeeper: Its purpose is

to "screen out meritless claims." *Kibler v. N. Inyo County Local Hospital District,* 39 Cal. 4th 192, 198 (2006). Thus it serves the same purposes as Rules 12 and 56. What's more, the anti-SLAPP statute operates in a procedural fashion: It is styled as a rule of civil procedure. It authorizes a "special motion to strike." It contains provisions limiting discovery and imposes civil sanctions on plaintiffs who fail to meet its evidentiary standard. Several courts – including this one – have characterized the statute as a "procedural device." *Id.; Jarrow Formulas, Inc. v. LaMarchce,* 31 Cal. 4th 728, 743 (2003); *Metabolife,* 264 F. 3d 832, 845.

But the anti-SLAPP statute conflicts with the Rules by *requiring the plaintiff to prove that he will probably prevail if the case proceeds to trial* —a showing considerably more stringent than pleading a facially plausible claim or identifying material factual disputes that a jury could reasonably resolve in plaintiff's favor.

In granting Defendant's anti-SLAPP motion, the Court ignored the conspicuous conflicts between the statute and Federal Rules, interfered with the operation of the Federal Rules and displaced the two exclusive procedural mechanisms for pre-trial dismissal that are available in federal court.

### 3. The *Newsham* Decision Should be Overruled.

In *United States ex rel. Newsham v. Lockheed Missles & Space Co.,* 190 F. 3d 963, this court addressed the question of whether the anti-SLAPP statute can be applied in federal court. There, Lockheed, the defendant in a *qui tam* action, brought state counterclaims (e.g., for breach of fiduciary duty and breach of loyalty) against a former employee who had reported its improper billing practices to the government. The informant responded to the counterclaims with an anti-SLAPP motion. The district court found that provisions of the Federal Rules conflicted with the anti-SLAPP statute and refused to apply the statute in federal court. On appeal, Lockheed argued that the trial court's failure to apply the statute

- 21 -

deprived it of its "substantive" right to attorney's fees and costs, and ran afoul of Erie.

The Ninth Circuit began its analysis in accordance with the *Hanna/Shady Grove* line of cases by asking whether the state law collides with the Federal Rules. Initially, it acknowledged that the statute and Federal Rules 12 and 56 serve the same procedural purpose: they "weed out meritless claims." However, having noted that the Rules and the statute address the same issue, the court swerved from the path prescribed by *Hanna* and *Shady Grove*. Instead of acknowledging the statute's conflicts with the Federal Rules, the court turned its attention to the *state* legislature's underlying objective in enacting the anti-SLAPP statute. *Newsham* at 973. But, under *Shady Grove*, the court may not consider the substantive "aims" and "objectives" of the conflicting state statute. To do so would produce "confusion worse confounded." *Shady Grove,* 559 U.S. 393, 404. The question is not whether the state law creates substantive rights but whether the Federal rule applies and conforms to the limitations of the REA.

Similarly, in *Hanna* court emphasized that even when the application of a Federal Rule has an adverse effect on state substantive rights, the Rule should be applied. To base a "conflict" determination upon the state legislature's objectives "would be to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act." *Hanna,* 380 U.S. 460, 473-474. *See also Woods,* 480 U.S. at 5 (Federal Rules control even when their application has an incidental impact on states' substantive rights.).

Moreover, in finding that the anti-SLAPP statute can 'co-exist' with the Federal rules, the *Newsham* court ignored ways in which the statute and the Rules directly collide. Indeed, in *Metabolife*, 264 F.3d 832, this court recognized that the discovery limiting aspects of the statute do not apply in federal court, thus altering

the asserted "objective" of the statute—providing a swift and inexpensive means of terminating litigation. *Id.,* 264 F.3d at 845.

*Newsham* was decided when the anti-SLAPP statute was relatively new and its implications and impact not fully explored. Petitioners respectfully urge the court to revisit the question of whether the anti-SLAPP statute can co-exist with the Federal Rules in an *en banc* panel.

> **B.** **The Court Erred in Dismissing the First Amended Complaint Pursuant to FRCP 12(b)(6) and CCP Section 425.1 6 Because it Alleged Facts Sufficient to Permit a Reasonable Inference that the Challenged Statements are Defamatory.**

In its December 16, 2014, Order granting Defendant's motion to dismiss the original complaint with leave to amend, the trial court held that Plaintiffs' defamatory meaning allegations were insufficient for two reasons. EOR Vol. 8, pgs. 1544-1557. First, it held that "Chanos does not make any outright assertion that Wynn violated the FCPA … [and] did not "reasonab[ly] impl[y] that Wynn violated the FCPA." The Court reasoned that "it takes a significant inferential leap to conclude that Chanos' general uncertainty about the questionable business method in Macau equates to an assertion that Wynn violated the FCPA." EOR Vol. 8, pg. 1551. Second, it held that Chanos' statements were ones of "opinion rather than fact." EOR Vol. 8, pg. 1551.

In the First Amended Complaint, Plaintiffs provided additional facts concerning the special knowledge of the audience to whom the statements were addressed and the circumstances under which the statements were made. When read with these facts in mind, no "inferential leap" was necessary to conclude that members of Chanos' audience could reasonably understand his statements to imply that (1) plaintiffs violated the FCPA, and (2) that Chanos implied the existence of undisclosed facts to support the opinion that his investment in Wynn was at risk because of specific FCPA violations that plaintiffs either committed or facilitated.

Nevertheless, in its March 3, 2015, Order granting Defendant's Motion to Dismiss and anti-SLAPP motion, the Court held that the challenged statements are not capable of a defamatory meaning "because the 'truth of the statement does not turn on a finding of fact that Wynn did or did not violate the FCPA." EOR Vol. 1, pg. 4-5. The Court further found that Chanos' "qualifying" language made it clear that the casino's actions were "within the legal limit." EOR Vol. 1, pg. 4-5.

The Court's reasoning is inconsistent with the "totality of circumstances" test that is applied to questions of defamatory meaning in the Ninth Circuit. It also ignores the well-settled rule that statements in the form of opinions can be actionable when they imply the existence of undisclosed defamatory facts about plaintiff.[17] Finally, it ignores the FAC's allegations of defamation by implication.

### 1. The challenged statements are capable of a defamatory interpretation when viewed in context.

In performing the defamatory meaning analysis, the court is required to "examine the statement in its totality in the context in which it was uttered or published. … [T]he court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980); *Baker v. L.A. Herald Examiner*, 42 Cal. 3d 254, 261 (1986) ("This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed."). A defamatory meaning must be found in a reading of the publication as a whole and in context. *See Kaelin v. Globe Comm. Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998).

---

[17] *See Milkovich v. Lorain Journal*, 497 U.S. 1 (1990); Restatement (Second) of Torts § 566; *Lewis v. Time, Inc.*, 710 F.2d 549 (9th Cir. 1983).

- 24 -

The courts have repeatedly held that the social and literary contexts in which speech appears have profound effects on meaning. Statements that can reasonably be interpreted as non-actionable opinion in some contexts can assume the character of actionable statements of fact in others, and vice versa.

In *Kaelin v. Globe Communications Corp.,* the Ninth Circuit held that, in the immediate aftermath of the O.J. Simpson murders, the statement, "Cops Think Kato Did It!," could reasonably be understood to mean that the police suspected Kato Kaelin of having committed the murders of Nicole Brown Simson and Ronald Goldman. Defendant's efforts to create ambiguity by couching the accusation in the language of opinion, ("he fears that they want him for perjury, pals say,") did not negate the defamatory implication. *Kaelin,* 162 F.3d 1036, 1040.

In *Church of Scientology v. Flynn*, 744 F.2d 694, 696-697 (9th Cir. 1984), the court held that, given public hostilities between the Church and the attorney defendant, defendant's account of a mid-flight engine shut-down could reasonably be construed as a charge that the Church attempted to murder him. The fact that defendant "did not specifically accuse CSC of attempting to cause [defendant's] death" did not rule out the reasonable inference that defendant tried to kill him. *Id*. ("It would be entirely reasonable for a jury to conclude that Flynn was accusing CSC … rather than merely describing something that had happened to him.").

In *Condit v. National Enquirer*, 248 F.Supp.2d 945, 965-966 (E.D. Cal. 2002), the court held that, in the midst of intense media coverage of Chandra Levy's disappearance, the statement, "Cops: Condit's wife attacked Chandra," was capable of several defamatory implications, including the implication that plaintiff was "obstructing justice" in the Levy investigation. The court reached this conclusion notwithstanding the conceded ambiguity of the word "attack," and the fact that the statement was presented in terms of what the police subjectively

believed.

The courts have repeatedly held that if the challenged statements in this case are capable of both defamatory and non-defamatory meanings, the court may not dismiss the complaint. It is for the jury to decide how the statements were actually understood. *Good Government Group of Seal Beach v. Superior Court*, 22 Cal. 3d 672, 682 (1978). "Even assuming that [another innocent] reading is reasonably possible as a matter of law[,] [s]o long as the publication is reasonably susceptible of a defamatory meaning, a factual question exists for the jury." *Kaelin v. Globe Comm. Corp.*, 162 F.3d at 1040. "It is error for a court to rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning." *Selleck v. Global International*, 166 Cal. App. 3d 1123, 1131 (1985).

Renowned linguistics expert Dr. Edward Finegan offered the district court his opinion about how a reasonable listener would understand the statements in light of the known contextual facts and after viewing the video of Respondent making the statements.[18] He concluded that readers would understand the statements to carry the same defamatory meaning ascribed by Appellants.[19] As one California court has explained, the use of a linguists expert can aid the fact finder in understanding how the average listener would understand statements, including whether they imply defamatory facts, considering the "context, juxtaposition of certain pieces of information, the choice of words, and the tone and inflection of the speaker. " *See Weller v. American Broadcasting Companies, Inc.*, 232 Cal. App. 3d 991, 1007-08 (1991).

---

[18] Appellants have filed a Motion for Leave to Transmit Physical Exhibits so that they may provide this Court with the videotape, which was previously filed and lodged with the District Court as Exhibit X to Docket Number 40.

[19] The basis of Dr. Finegan's conclusions is discussed where relevant, below.

2.    **The audience was repeatedly told that Macau gambling was suffused with crime.**

From the outset, audience members were told that the Macau gambling industry is suffused with crime.  They were told that panelist David Barboza had long been "reporting on *corruption* in China."  Barboza told them that, *"the rule of law is not in place in China yet,"* and that this is "*the robber baron's era you're finding in China."*[20]  *See* EOR Vol. 10, pg. 1981.[21]  Another panelist, "Shrimp Boy" Chow, was described as a *criminal in federal custody.*[22]

These remarks immediately preceded Chanos' statements.  These statements predisposed the audience to understand that the U.S. casino operators in Macau were *"The Gods of Gambling,"* that they did business in an environment of lawlessness, that they countenanced (and possibly participated in) illegal activity.  EOR Vol. 8, pgs. 1476-1477.

Chanos' remarks reinforced the audience's perception that U.S. Casinos in Macau are *in fact* riddled with illegal activity.  He stated that he was initially "long [in] Macau" (i.e., he held an equity position in the U.S. based casinos in Macau, including "Mr. Wynn's) because he wanted to be "long corruption, short property."  EOR Vol. 8, pgs. 1493-1495.  The panel's overarching theme was that that crime is rife in the casinos of *The Gods of Gambling*.  Chanos told the audience that, after "digging deep" into the operations of the Macau casinos in which he invested, he became concerned about FCPA violations.  He implied that the information uncovered in his investigation caused the "concern" that led him to sell or short plaintiffs' stock.  EOR Vol. 8, pgs. 1493-1495.

At least that is one reasonable inference that can be drawn from his

---

[20] EOR Vol. 8, pg. 1492.
[21] Declaration of Edward Finegan.  Filed in support of Plaintiffs' Opposition to Defendant's Special Motion to Strike the original complaint.
[22] EOR Vol. 8, pg. 1490.

statements.  Chanos did not sell or short Wynn's stock on a whim.  He took that action because his deep digging uncovered evidence that the FCPA was being violated in the U.S.-based casinos in Macau.  There are only three such casinos.  Chanos admitted holding stock in the ones owned by "Mr. Adelson and Mr. Wynn."  EOR Vol. 8, pgs. 1493-1495.

### 3. The audience knew Chanos' reputation for uncovering corporate corruption by conducting intensive research

Members of the audience knew that Chanos became famous by uncovering misleading accounting, inadequate financial reporting and outright fraud at Enron and then selling its stock short.  They knew that he made his fabled short sale decision after conducting intensive research into the company and finding hard evidence of corporate corruption.  They knew that Chanos is an expert in "research-based" short selling.  EOR Vol. 8, pgs. 1475-1476.

Because Chanos' statements responded to the question, "Why did you short Macau?" the audience reasonably anticipated that Chanos' answer would set forth the basis of his decision to take a short position in Macau casino stock.  EOR Vol. 8, pg. 1477.  Because they knew Chanos' background as a *research-based* short seller, audience members could reasonably infer that the decision was not based on a subjective feeling but on objective facts obtained by intensive research.

In essence, Chanos told the audience that he abandoned his equity position in Wynn Macau because his deep investigation caused him to believe that FCPA violations were occurring there.  While this is expressed as a perception, it implies the existence of undisclosed facts that support it.

In its order, the Court suggests that Chanos was merely expressing a "concern" about a "risk," and that such a subjective statement cannot be proven true or false. EOR Vol. 1, pgs. 5.  However, even assuming the reasonableness of that interpretation, it is by no means the only reasonable interpretation that flows

from the statements.  It is equally reasonable to infer that, in the process of having "dug" "deeper," Chanos found evidence of FCPA violations by "Mr. Wynn," "U.S. casino operator[]" "in Macau," and that the "risk" in question was the risk that his [Chanos'] clients would lose money if the violations of the FCPA discovered by Chanos came to light.

That a statement is capable of an innocent interpretation does not insulate it from liability.  The court's defamatory meaning inquiry "*is not to determine whether the publication may have an innocent meaning but rather to determine if it reasonably conveys a defamatory meaning. [] In making that determination, we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the publication.*"  *Selleck v. Global International*, 166 Cal. App. 3d 1123, 1131 (emphasis added).

### 4.    Chanos described Mr. Wynn's Macau casino in pejorative terms.

Chanos went on to describe Macau's U.S.-based casinos as unscrupulous and dishonest: "…they hide behind the façade of the junket companies,"[23] they "attempt to mislead" and "attempt to obfuscate." These descriptions tell listeners that Plaintiffs attempt to hide unspecified wrongdoing. As such, they strengthen the already reasonable inference that Plaintiffs violated, or facilitated the violation of, the FCPA, but covered up the violation.

Chanos also stated that Mr. Wynn's casino commits "legal fraud."[24] He explained to the audience that "legal fraud" was a term used by Bethany McLean, author of the best-selling account of the Enron scandal, *The Smartest Guys in The Room*, a book in which Chanos figures prominently.  Members of the audience who read the book never encountered the phrase.  Discovery would show that

---

[23] EOR Vol. 8, pg. 1494.
[24] EOR Vol. 8, pg. 1494.

members of the audience who saw the documentary adaptation of the book knew that McLean never spoke the words, "legal fraud." Rather, she said that Enron "crossed the line into *outright fraud*."

Members of the audience could reasonably infer from Bergman's comment, "You're famous, obviously, for shorting Enron; why are you shorting Macau?," that Chanos' purpose on the panel was to compare his investment decisions in Macau casinos to his investment decisions in Enron, and that the comparison was apt because both corporations engaged unlawful conduct. EOR Vol. 10, pgs. 1983-1984.

### 5. <u>Chanos' qualifying language did not neutralize the defamation.</u>

In the context of a discussion in which the audience has been told that *the rule of law* is not in place, that it is an *era of robber barons*, the phrase, "*they* [*i.e.*, U.S. casino operators like Mr. Wynn] *might be adhering to every aspect of the legal requirements*," does nothing to negate the defamatory sting of Chanos' statements. In fact, it can readily be understood an additional indictment. After all, the audience has already been informed that legal requirements are a sham in Macau, and that the U.S. casino operators – *The Gods of Gambling* – are above the law. This is particularly clear given that the phrase appears after the word, "although," (*i.e.*, "regardless of the fact that") and immediately before the charges that U.S. casinos "*hide behind the junket companies*," "*mislead*," "*attempt to obfuscate*" and commit "*legal fraud*."

### 6. <u>The FAC's allegations concerning context are key to the defamatory meaning analysis.</u>

The court ignores context in which Chanos spoke. Instead, it seizes upon individual phrases – "I got a little nervous," "the deeper we dug into Macau the more I got concerned," "I began to get really concerned about the risk I was taking

with my clients' money under the Foreign Corrupt Practices Act."  The court concluded that these phrases denote subjective perceptions rather than fact. But the totality of circumstances test prohibits requires the court to consider not only the language used by the speaker but the specific and general contexts in which the statements were made and the understanding of the audience to whom the words are spoken.  *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1054 (9th Cir. 1990); *Underwager v. Channel 9 Australia*, 69 F. 3d 361, 366 (9th Cir. 1995).  Here, the statements were made in the context of a discussion of a serious problem – illegality in Macau gambling.  The audience understood that Chanos took a "short" position in the U.S.-based Macau casinos operated by "Mr. Wynn."  They anticipated that Chanos would explain "why" he took that short position, and Chanos told them he did so because he investigated and found that violations of the Foreign Corrupt Practices Act put his investments in the U.S.-based casinos at risk. In *Bently Reserve, LP v. Papaliolios,* 218 Cal. App. 4th 418, 428 (2013), the court's defamatory meaning analysis turned not simply on the words published but on the expectations of the audience and the status of the speaker.  It held that the phrase, "[plaintiff's] abhorrent behavior likely contributed to the death of three tenants" was an actionable statement of fact despite the qualifying word, "likely." The court explained that, when the "tone and contents" of the challenged speech are serious, and the speaker represents himself as "having specialized knowledge," as Chanos did in this case, the statement may reasonably perceived as asserting a false statement of fact – notwithstanding qualifying language. *Id*.

Chanos implied that he uncovered evidence of actual FCPA violations by Plaintiffs.  He did not state an abstract concern about an unidentified investment risk.  He specifically stated that he was "long" in "Mr. Wynn's" casino, but "got out of Macau" after having "dug" "deeper" into "exactly how business is done there."  EOR Vol. 8, pgs. 1999-2001.  He cited an extremely specific, indeed,

specialized, "concern" – FCPA violations – as the precipitating factor in his decision to abandon his equity position in Wynn's stock. EOR Vol. 8, pgs. 1999-2001. Given this level of specificity, and given the audience's knowledge of Chanos' background, the audience can reasonably infer that the "concern" about "risk" was based on hard evidence of plaintiffs' FCPA violations that Chanos uncovered during his investigation.

Second, Chanos' use of the words "concern" and "risk" does little to reduce the defamatory impact of his statements. As the court observed in *Overstock.com, Inc. v. Gradient Analytics, Inc*., 151 Cal.App.4th 688, 703-704 (2007), "[s]tatements in the publications do not attain constitutional protection simply because they are sprinkled with words to the effect that something does or does not appear to be thus and so, or because they are framed as being 'in our opinion,' *or 'as a matter of 'concern.'"* Such devices do not "necessarily defuse[] the impression that the speaker is communicating an actual fact." *Id*. at 704.

Chanos' statements drew a causal connection among matters of undisputed fact: (1) Chanos' "long" investment in Wynn's Macau casino, (2) his having "dug" "deeper" into Macau business practices, (3) his discovery of undisclosed information related to FCPA violations in U.S. based Macau casinos, and (4) his short sale of Wynn's stock. This is more than enough information to permit listeners to connect the dots.

Third, even if we allow that Chanos' statements took the form of "opinions," it is well settled that a defamer cannot escape liability by couching his statements in subjective language. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17; *Wilbanks v. Wolk,* 121 Cal. App. 4th 883, 902 (2004) (expressions in the form of an opinion can imply assertions of objective fact). In *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1439-1440 (9th Cir. 1995), the court explained that a statement of opinion may be actionable when based on undisclosed facts that are

themselves defamatory. "When the facts underlying a statement of opinion are disclosed, readers will understand that they are getting the author's interpretation of the facts presented," and are free to form their own opinion based on those facts. *Id.* at 1439. However, when the factual basis for a statement of opinion is not disclosed, "readers []will reasonably understand the author to be implying he knows facts supporting his view." *Id.*[25]

Statements of opinion based on disclosed facts are protected only when the facts are complete and true. "Where a publication sets forth the facts underlying its statement of opinion ... and those facts are true, the Constitution protects that opinion from liability for defamation." *Standing Committee on Discipline*, 55 F.3d at 1140 (quoting *Lewis v. Time, Inc.*, 710 F.2d 549, 556 (9th Cir. 1983)). The logic behind the rule is straightforward and unassailable: When a publisher prints an opinion but doesn't state the basis for it, the reader may infer a factual basis that doesn't exist. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20–21. But when a publisher accurately discloses the facts on which he bases his opinion, the reader can gauge for himself whether the factual basis adequately supports the opinion. *See Unelko v. Rooney*, 912 F.2d 1049, 1055 (the statement, "It didn't work" was a mixed opinion implying product did not perform as warranted); *Lewis v. Time, Inc.,* 710 F.2d at 556 (the statement, "[plaintiff] is a shady practitioner" is protected because based on fully disclosed accurate facts.).

The mixed opinion rule is squarely applicable here. When listeners heard that Chanos "shorted Macau" because of a "the risk [he] was taking with clients' money under the [FCPA]," after having "dug" "deeper," they could reasonably infer that he is in possession of concrete information sufficient to support that

---

[25] *E.g.,* I think Jones is an alcoholic implies that the speaker has personal knowledge that, e.g., Jones stops at a bar every night and has three martinis. If the implied facts are false and defamatory, the opinion is actionable.

business decision.  In this context, where Chanos' reputation as a research-based short seller figured prominently, listeners could reasonably understand that Chanos "shorted Macau" for the same reason that he shorted Enron.  He investigated, found evidence of a particular form of wrongdoing, and made a bet that the value of the company's stock would decline. *See* EOR Vol. 8, pgs. 1494 ("[R]isk is consequent to a potential indictment" for violation of FCPA.).

The Court held that the "truth of [Chanos'] statement does not turn on a finding that Wynn did or did not violate the foreign corrupt Practices Act.[26]  The analysis is flawed because it ignores the undisclosed facts implied by Chanos' statements of 'concern."  The audience could reasonably understand that Chanos' decision to sell his Wynn stock *was based* on the undisclosed evidence of Wynn's FCPA violations.  From there, no inferential leap is required to form the inference that appellants had, in fact, committed such violations.  Importantly, Chanos did not refer to any "other" bases for his concern.  He gave only one concrete reason for selling and/or shorting Wynn's stock:  FCPA violations.

## C.    The District Court Erred in Finding that Appellants Failed to Make a *Prima Facie* Showing of Actual Malice

The question of actual malice – whether defendant made is statements with knowledge of their falsity or reckless disregard for truth – is one of *fact*.  It is for the trier of fact to decide whether defendant published in bad faith. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  Actual malice exists if the statement is fabricated or so inherently improbable that no reasonable person would believe it to be true. *Id.* at 732.  No single "smoking gun" is required.  Actual malice may be proven by accumulation of circumstantial evidence. *Eastwood v. National Enquirer*, 123 F.3d 1249, 1253 -1256 (9th Cir. 1997) ("As we have yet to see a

---

[26] EOR Vol. 5, pg. 755.

- 34 -

defendant who admits to entertaining serious subjective doubt we must be guided by circumstantial evidence."). In making a finding of reckless disregard for truth, the court considers evidence of common law malice, *i.e.*, ill will, negligence, editorial decisions and other circumstantial evidence. *Bose Corp v. Consumers Union*, 692 F.2d 189, 196 (1st Cir. 1982) *aff'd* 104 S. Ct. 1949 (1984). Simply stated, it is for the trier of fact to view the mosaic of circumstantial evidence and decide whether the standard has been met.

Moreover, because a finding of actual malice entails a determination as to the defendant's subjective state of mind, important evidence of its existence is necessarily in the unique possession of the defendant. The actual malice analysis cannot be undertaken in the complete absence of discovery.

The need for discovery is particularly apparent in this case since Chanos submitted no judicially noticeable material to suggest that he had a reasonable basis for believing that Plaintiffs violated FCPA or countenanced its violation.

Chanos did not declare that he read any of the many media reports or SEC filings he proffers. Even if he had, the trial court could not weigh that evidence in determining actual malice or any element of the tort. In the context of an anti-SLAPP motion, the court may only consider defendant's evidence if it defeats plaintiff's claim as a matter of law. *Overstock.com, Inc.*, 151 Cal. App. 4th 688, 699-700 (Court does not "evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law."). *See also Navellier v. Sletten*, 29 Cal. 4th 82, 89, 124 (2002).

Here, there are factual disputes about what the proffered documents state or imply, whether Chanos read them prior to publication, whether he had reason to doubt their reliability, and whether he had contradictory information. In sum, Chanos' volumes of "evidence" do *not* establish, as a matter of law, that Chanos

- 35 -

did *not* publish with actual malice. They cannot be weighed against Plaintiffs' evidence of actual malice.

Even if the court were entitled to weigh Chanos' non-dispositive evidence, the fact remains that the SEC filings (Wynn Resort's 10Ks and 10Q) do not state that Plaintiffs violated the FCPA. On the contrary; they make clear that Plaintiffs were referring to *Kazuo Okada and Aruze USA, Inc.'s* suspected FCPA violations. The filings show that Okada was not acting in his capacity as a member of Wynn Resorts' board when he engaged in the misconduct. They further demonstrate that, when the potential violations came to Wynn Resorts' attention, the company conducted a rigorous investigation of Okada and Aruze, removed Okada from its board of directors, took actions to protect itself and its operations from Okada's influence, and reported Okada's actions in detail to the to the SEC in compliance with its ongoing disclosure obligations. *See* EOR Vol. 8, pgs. 1367-1370; EOR Vol. 15, pg. 3441 (The Freeh report, which was publicly available online at the time of Chanos' slander, states that Okada and Aruze have committed *prima facie* violations of the FCPA and that those violations affect "*Okada's suitability* under Nevada law as both a major shareholder and a director" of Wynn Resorts. The report makes clear that it was Okada, not Wynn, who violated the FCPA.).

Appellants submit that they put on *prima facie* evidence of actual malice. *First*, Chanos published in the face of Wynn's very public and repeated denials that he or Wynn Resorts had committed any FCPA violation. EOR Vol 10, pgs. 1920-1956. By disregarding those pre-publication denials, Chanos acted with reckless disregard for truth. In *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992), the court found that a magazine published with actual malice when it ignored plaintiff's pre-publication denials that that he spoke the words attributed to him in a draft of the subject article and published it without correction.

*Second*, Chanos ignored the widely publicized findings of the SEC and Nevada Gaming Commission's ("NGC") investigations, both of which found *no evidence* of FCPA violations on plaintiffs' part. On July 8, 2013 – nine months prior to Chanos' slander – Wynn Resorts disclosed the results of the agencies' investigations in 2013 8-K filing with the SEC. The 8-K stated that the SEC "had closed its investigation and advised that it was not intending to recommend any enforcement action." It further stated that the NGC "found no violations" of the FCPA. EOR Vol 10, pgs. 1917-1923.

The actual malice standard is satisfied when defendant publishes in the face of known contradictory evidence, *i.e.*, when he purposefully avoids facts that would undermine the premise of his statements. *Suzuki Motor Corp. v. Consumers Union of U.S. Inc.,* 330 F.3d 1110, 1136-1137 (9th Cir. 2003); *Harte Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 692 (1989) (Purposeful avoidance of the truth, without more, satisfies the actual malice standard.); *Curtis Publishing Co., v. Butts,* 388 U.S. 130, 158 (1967) (Publication based on a known unreliable account constitutes actual malice.).

Chanos is a sophisticated investor who makes his living by examining SEC filings. EOR Vol. 8, pg. 1485. He, of all people, had reason to know that the SEC and NGC investigated plaintiffs and found no evidence of misconduct. He, of all people, had reason to know that plaintiffs' SEC filings did not show that plaintiffs violated the FCPA. EOR Vol. 8, pg. 1485. This evidence of actual malice more than satisfies the minimal requirements of California Code of Civil Procedure Section 425.16(b).

## VIII. <u>CONCLUSION</u>

The District Court erred when it dismissed Appellants' complaint. Appellants' complaint alleged facts that were more than sufficient to state a claim

for defamation and survive the Motion to Dismiss. As to the anti-SLAPP motion, even if California's anti-SLAPP statute could be applied in Federal Court (which it cannot) and even if Appellants were not entitled to some discovery (which they were), Appellants sufficiently demonstrated the merits of their claim and the motion should have been denied.

Therefore, Appellants Stephen Wynn and Wynn Resorts respectfully request that this Court reverse the District Court's orders, in full.

Dated: August 3, 2015                    Respectfully submitted,

                                         BROWNSTEIN HYATT FARBER &
                                         SCHRECK, LLP


                                         /s/ Mitchell J. Langberg
                                         Barry B. Langberg, Esq.
                                         Mitchell J. Langberg, Esq.
                                         Deborah D. Drooz, Esq.
                                         Margo J. Arnold, Esq.
                                         *Attorneys for Plaintiffs-Appellants*
                                         STEPHEN WYNN and
                                         WYNN RESORTS LIMITED

## <u>STATEMENT OF RELATED CASES</u>

In accordance with Ninth Circuit Local Rule 28-2.6, Plaintiffs –Appellants Stephen Wynn and Wynn Resorts Limited hereby state that there are no related cases pending in this Court.

Dated:  August 3, 2015

Respectfully submitted,

BROWNSTEIN HYATT FARBER &
SCHRECK, LLP

/s/ Mitchell J. Langberg
Barry B. Langberg, Esq.
Mitchell J. Langberg, Esq.
Deborah D. Drooz, Esq.
Margo J. Arnold, Esq.
*Attorneys for Plaintiffs-Appellants*
STEPHEN WYNN and
WYNN RESORTS LIMITED

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,626 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman.

Dated: August 3, 2015               Respectfully submitted,

                                    BROWNSTEIN HYATT FARBER &
                                    SCHRECK, LLP


                                    /s/ Mitchell J. Langberg
                                    Barry B. Langberg, Esq.
                                    Mitchell J. Langberg, Esq.
                                    Deborah D. Drooz, Esq.
                                    Margo J. Arnold, Esq.
                                    *Attorneys for Plaintiffs-Appellants*
                                    STEPHEN WYNN and
                                    WYNN RESORTS LIMITED

### **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United State Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 3, 2015.

I certify that all participates in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Mitchell J. Langberg
MITCHELL J. LANGBERG